**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In Re:

                                                    **Case No. 10-62669-6-dd**

**SHERRILL MANUFACTURING, INC.,**

                    **Debtor.**

_____

### SECOND SHERRILL MANUFACTURING, INC. DISCLOSURE STATEMENT

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## I. INTRODUCTION

This is the second disclosure statement (the "Disclosure Statement") in the business Chapter 11 case of Sherrill Manufacturing, Inc. (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes the second proposed Chapter 11 plan (the "Plan") filed by the Debtor. A copy of the Plan (without exhibits) is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

### A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

B. **Deadlines for Voting and Objecting**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

      1.    *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether to confirm the Plan will take place on [insert date] , at [insert time],  at the Utica Bankruptcy Court Alexander Pernie Federal Building, 10 Broad St., Utica, NY 13501 .

      2.    *Deadline For Objecting to the Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtor by [insert date].

      3.    *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact the attorney for the Debtor at the following address:

Neil J. Smith, Esq.
Mackenzie Hughes LLP
101 South Salina St.
PO Box 4967
Syracuse, NY 13221
nsmith@mackenziehughes.com
315-233-8226

C. **Disclaimer**

**The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.**

D. **Definitions.**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in the Plan and this Disclosure Statement:

1. "Administrative Claim" means a Claim for costs and expenses of administration under Section 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (b) the value of any goods received by the Debtor within 20 days before the Petition Date in which the goods were sold to the Debtor in the ordinary course of the Debtor's business; (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Section 330(a) or 331 of the Bankruptcy Code; (d) all fees and charges assessed against the Estate under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Claims Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

2. "Administrative Claims Bar Date" means collectively (i) the last date set by the Bankruptcy Court pursuant to an Administrative Claims Bar Date Order for a Claimant to file a request for payment of any Administrative Claim that arose between the Petition Date and the date specified in the order, or any claim for the value of any goods received by the Debtor within twenty (20) days before the Petition Date in which the goods were sold to the Debtor in the ordinary course of the Debtor's business.

3. "Administrative Claims Bar Date Order" means the order or orders setting any Administrative Claims Bar Date, which order could be the Confirmation Order.

4. "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by Debtor in its Schedules as other than disputed, contingent or unliquidated and as to which Debtor or other party in interest has not Filed an objection on or before the 365th day after the Effective Date; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been Filed; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Debtor on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Claim or Priority Tax Claim executed by (x) the Debtor and approved by the Bankruptcy Court or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtor in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Claimant before the applicable Rejection Bar Date for such claim or has otherwise been deemed timely Filed under applicable law; or (f) a Claim that is Allowed pursuant to the terms of this Plan.

5. "Allowed Claim" means a Claim that has been Allowed.

6.  "Avoidance Actions" mean all claims and causes of action which the Debtor has or had the power to assert pursuant to any or all of Sections 510, 544-553 of the Bankruptcy Code.

7.  "Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

8.  "Bankruptcy Court" means the United States District Court for the Northern District of New York having jurisdiction over this Chapter 11 Case and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code and/or the General Order of such District Court pursuant to Section 151 of title 28 of the United States Code, the bankruptcy unit of such District Court.

9.  "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the General, and Local Rules of the Bankruptcy Court.

10.  "Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)).

11.  "Chapter 11 Case" means the case commenced under Chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date, styled In re Sherrill Manufacturing, Inc., currently pending before the Bankruptcy Court.

12.  "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against Debtor, including, but not limited to: (a) any right to payment from Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

13.  "Claimant" means the Holder of a Claim.

14.  "Class" means a category of Holders of Claims or Equity Interests as set forth in Article 3 of the Plan.

15.  "Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in this Chapter 11 Case.

16.  "Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in the Plan.

{M0259774.2 }

17. "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

18. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtor and the Committee.

19. "Consummation" or "Consummate" means the occurrence of or to achieve the Effective Date.

20. "Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

21. "Creditor" means any Holder of a Claim against Debtor that arose on or prior to the Petition Date.

22. "Debt" means liability on a Claim.

23. "Debtor" means Sherrill Manufacturing, Inc., and includes Sherrill Manufacturing Inc. after the Effective Date of the Plan (the 'Reorganized Debtor").

24. "Debtor in Possession" means Sherrill Manufacturing, Inc., as debtor in possession in this Chapter 11 Case pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

25. "Disallowed Claim" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

26. "Disclosure Statement" means Debtor's Disclosure Statement, as amended, supplemented, or modified from time to time, describing the Plan, that was prepared and distributed in accordance with the Bankruptcy Code and Bankruptcy Rules and other applicable law.

27. "Disputed" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent; (b) as to which Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is

{M0259774.2 }

otherwise disputed by Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or (c) unless otherwise indicated in the Plan, a Claim as to which the period within which to object to such Claim has not yet expired.

28.  "Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of the Effective Date or any later deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim for which a proof of Claim is required to be filed and no such Proof of Claim is filed or, if filed, is filed after the applicable Bar Date for such Claim; (iii) any Contingent Claim or Unliquidated Claim; (iv) any Claim scheduled by the Debtor in the Schedules as disputed, contingent or unliquidated; (v) a Proof of Claim filed in a greater amount, or of a different nature or priority, than the amount, nature, or priority listed for that Claim in the Schedules; or (vi) a Claim that is not listed in the Schedules. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection and shall be deemed Allowed as to the portion for which no objection is made.

29.  "Disputed Claims Amount" means the aggregate amount of Disputed Claims that are fixed and absolute. For purposes of calculating distributions of Cash under the Plan, the amount of each Disputed Claim shall be based upon either: (i) the face amount of such Creditor's Disputed Claim (or the disputed portion thereof) as set forth in the Creditor's filed proof of Claim; (ii) the amount at which the Bankruptcy Court may estimate such Disputed Claim; or (iii) the amount which the Debtor determines in its reasonable judgment is the appropriate amount to be reserved for such Disputed Claim.

30.  "Effective Date" means the date selected by Debtor which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in the Plan have been satisfied, unless waived by the Debtor and the Committee in writing.

31.  "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

32. "Equity Interest" means any equity interest in Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

33.  "Estate" means the estate of the Debtor in this Chapter 11 Case created pursuant to Section 541 of the Bankruptcy Code upon the commencement of this Chapter 11 Case.

34.  "File" or "Filed" means file or filed with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

35. . "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

36.  "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) which has not been reversed, stayed, modified or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

37.  "Final Resolution Date" means the date on which all Disputed Claims in each and every Class shall have been resolved by Final Order or otherwise finally determined.

38. "General Bar Date" means the date set by the Bankruptcy Court as the last day for filing a Claim arising prior to the Petition Date against the Debtor in this Chapter 11 Case.

39.  "Governmental Unit" means the United States and any state, commonwealth, district, territory, municipality, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), or any foreign state.

40.  "Holder" means an Entity holding a Claim or Equity Interest.

41.  "Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

42.  "Insider" means an insider of any Debtor, as defined in Section 101(31) of the Bankruptcy Code.

43.  "Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind) to secure payment of a debt or performance of an obligation.

44. "Objection Deadline" means the date established by the Bankruptcy Court for the filing of any objection to the Plan.

45.  "Petition Date" means October 4, 2010, the date on which Debtor filed its petition for relief commencing this Chapter 11 Case.

46.  "Plan" means this Amended Plan of Reorganization, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, any exhibits and schedules hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions hereof.

47.  "Plan Interest Rate" means the rate of interest determined by the Bankruptcy Court upon Confirmation, if necessary, for purposes of the application of section 1124 (impairment)

or section 1129(b) of the Bankruptcy Code (Present Value), as the case may be, to the distributions to certain Creditors under the Plan. The Plan Interest Rate may be different for different Classes of Claims.

48.   "Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

49.   "Priority Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

50.   "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

51.   "Professional" means an Entity: (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

52.   "Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331 and/or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

53.   . "Proof of Claim" means a proof of claim Filed pursuant to Section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

54.   "Schedules" means the schedules of assets and liabilities as the Bankruptcy Court required the Debtor to file pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and Debtor's statement of financial affairs filed with the Bankruptcy Court, as the Bankruptcy Court required the Debtor to file pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

55.   "Secured Claim" means any Claim, excluding stock appreciation rights, that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

56.   "Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*,

{M0259774.2 }

estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any
interest or additions attributable to, imposed on or with respect to such assessments.

57.  "Tax Claim " means all or that portion of an Allowed Claim held by a Governmental
Unit for a tax assessed or assessable against the Debtor, including income and
employment taxes and any related penalties or interest.

58. "Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of
the Bankruptcy Code.

59.  "Unliquidated Claim" means any Claim for which a Proof of Claim has been filed with
the Bankruptcy Court but was not filed in a sum certain, and which Claim has not been
estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective
Date.

60.  "Unsecured Claim" means any Claim against the Debtor or its Estate (including, but not
limited to, stock appreciation rights, general trade claims, or other debts of the Debtor)
that is not otherwise a Secured Claim, Administrative Claim, Priority Tax Claim or
Priority Claim.

61.  "U. S. Trustee" means the Office of the United States Trustee for Region 3.


## II.    BACKGROUND

### A. **Description and History of the Debtor's Business**

The Debtor is a New York Business Corporation. Its office and principal assets are
located in a leased space at a 94 acre manufacturing and warehousing site with an address of 102
East Seneca Street, Sherrill, New York ("the Facility"). The Debtor recently sold the Facilty to
ONX3, LLC and currently leases approximately 240,000 sft on a long term lease ("the Leased
Space").  The Leased Space includes a fully equipped flatware factory owned by the Debtor as
well as excess flatware making equipment, inventory and tooling.   The current manufacturing
site was established by the Oneida community in the early 1800's. The original factory
manufactured bear traps, canned goods and leather items. In the late 1800's the facility began to
produce silverware. Ownership passed to Oneida Limited in 1880, and production was
dramatically increased through the 1990's.

Facing stiff competition from importers in combination with changing market conditions,
Oneida Ltd. was forced to cease manufacturing operations in North America and sold the
Facility to the Debtor on March 22, 2005. The Debtor was formed in 2005 to acquire the
manufacturing assets of Oneida Ltd. and operate as an independent supplier of flatware and
silverware to Oneida Limited.  In addition to operating as an independent supplier to Oneida
Limited, the Debtor also supplied flatware and silverware other customers, including sales under
a contract with the United States Government.

During the pendency of this case, the Debtor has sold the Facility to ONX3 LLC, and leased back the space needed for its manufacturing operations. This allowed the debtor to satisfy all of the claims of its secured creditors, as well as avoid the ongoing costs associated with the operation and maintenance of the entire Facility.

## B. **Insiders of the Debtor**

The following individuals are insiders of the Debtor as defined by 101(31) of the United States Bankruptcy Code (the "Code"):

1.  Gregory L. Owens, Executive Vice-President of Sherrill Manufacturing, Inc.  During the pendency of the bankruptcy case, Mr. Owens received $205,359.48 in compensation from the Debtor.
2.  Matthew A. Roberts, President of Sherrill Manufacturing, Inc. During the pendency of the bankruptcy case, Mr. Roberts received $175,326.80 in compensation from the Debtor.

## C. **Management of the Debtor Before and During the Bankruptcy**

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were Gregory L. Owens and Matthew A. Roberts.

The Managers of the Debtor during the Debtor's chapter 11 case have been: Gregory L. Owens and Matthew A. Roberts.

Throughout the Bankruptcy, the Debtor has continued to operate its business as a Debtor-in-Possession and pursuant to various Cash Collateral Orders issued by the Court.  Most recently, Debtor has been operating pursuant to the Stipulated Second Final Order Authorizing Use of Cash Collateral dated October 5, 2011.

On the Effective Date of the order confirming the Plan, the directors and officers of the Debtor ,or successor of the Debtor under the Plan (collectively the "Post Confirmation Managers"), will be:

Gregory L. Owens, Executive Vice-President of Sherrill Manufacturing, Inc.

Matthew A. Roberts, President of Sherrill Manufacturing, Inc.

## D. **Events Leading to Chapter 11 Filing**

Prior to the Filing Date and since its purchase of its Facility from its predecessor in interest in 2005, the Debtor has aggressively marketed itself and pursued various strategies to grow its business. Despite these efforts, the Debtor was unable to generate sufficient revenues to service all of its debt obligations. The recent economic downturn, combined with intense foreign

competition, had made it impossible for the Debtor to operate profitably as a manufacturing concern in New York State without a significant reorganization.  In the year prior to the Filing Date, the Debtor attempted to find a buyer for the Facility so that it could pay off its obligations from the proceeds of the sale, lease back a portion of the Facility's space from the buyer, and continue manufacturing in a scaled down operation.  Although the Debtor found some parties that were interested in purchasing the Facility, none of the interested parties ultimately appeared to be willing or able to purchase Facility.  In the meantime, the Debtor's inability to generate sufficient revenues from its manufacturing business rendered it unable to meet its daily obligations, and its cash reserves were rapidly depleted in the three months prior to the Filing Date.

The owners of the Debtor recognized that given the rate at which the Debtor was burning through its cash and the fact that the Debtor would not be able to sell the Facility in the immediate future meant that the only remaining option was to shut down the Debtor's main manufacturing operations and commence a liquidation of the Debtor's unused manufacturing and real estate assets to satisfy its obligations.

In the three months prior to the Filing Date, the Debtor laid off approximately 45 employees.  The Debtor retained 16 employees (including Matthew Roberts and Gregory Owens) that were needed to maintain the facility, continue to provide services to the current tenants that are leasing space in the Facility from the Debtor, continue plating, waste treatment, and machine shop operations, as well as to continue to supply the United States government pursuant to its supply contract.  On October 4, 2010, Debtor commenced the instant Chapter 11 Bankruptcy action to reorganize its operations.

### E. **Significant Events During the Bankruptcy Case**

Throughout the pendency of this Chapter 11 Bankruptcy, the following significant events occurred:

1. This Chapter 11 Bankruptcy action was commenced on October 4, 2010 by the filing Chapter 11 Voluntary Petition in the United States Bankruptcy Court for the Northern District of New York, Utica, NY (the "Court") by Sherrill Manufacturing, Inc. ("Debtor").

2. On October 26, 2010, an Official Committee of Unsecured Creditors was appointed.

3. On December 13, 2010, the Court authorized Debtor to Pay Claims of Critical Trade Vendors pursuant to the Debtor's amended motion.

4. On January 19, 2011, the Court authorized Debtor to employ Mackenzie Hughes LLP to represent the Debtor for the purposes of this Chapter 11 proceeding.

5. The Debtor was authorized to employ accountants Fust Charles Chambers LLP *nunc pro tunc* on March 17, 2011.

6. On March 17, 2011, the Court authorized Debtor to employ Kay Real Estate, Inc. as real estate broker to market and sell real property of the debtor located at 146 East Seneca St., Sherrill, NY and issued an Order authorizing the sale of this property.

7. On March 17, 2011, the Court issued an Order establishing procedures for the Sale of Debtor's property in the ordinary course of business.

8. On April 18, 2011, the Court granted authorization for the Debtor to enter into a Premium Financing Agreement with AFCO Credit Corp. in order to allow for financing of certain insurance premiums so that the Debtor could obtain insurance.

9. On or about April 29, 2011, the Court authorized Debtor to lease a portion of is warehousing space to Aqua Vita Farms, LLC.

10. On or about August 11, 2011, Debtor sold a portion of its real property, including a building thereon, known as 146 E. Seneca St.

11. On November 10, 2011, the Court denied a motion to lift the automatic stay to terminate the PILOT agreement brought by Sherrill City School District, the City of Sherrill, and the Town of Vernon.

12. On or about August 23, 2011, this Court authorized Debtor to employ New Hart Corporation, d/b/a Hart Corporation and Pyramid Brokerage Company, Inc. to market and rent or sell all or any portion of the Debtor's real property and buildings located thereon located at 102 E. Seneca St., Sherrill, NY.

13. By Order dated May 31, 2012, Great American Group, LLC ("Auctioneer") was appointed as the auctioneer for Debtor, and Debtor was authorized to sell a portion of its assets at auction, retain and employ Great American Group, LLC, enter into agreements and consummate all transactions related to the proposed sale, and pay Great American Group, LLC upon the completion of the sale. A public auction of Debtor's property was conducted on Thursday, July 19, 2012, during which a portion of Debtor's property was sold.

14. On March 13, 2013 the Court authorized the Debtor to sell its real estate assets and lease back the space needed for its manufacturing assets from the purchaser, ONX3 LLC. The proceeds of the sale/leaseback were utilized to satisfy all of the Secured Claims against the Debtor. In addition, the sale has allowed the Debtor to avoid the high maintenance and utility costs that had been associated with the ownership of The Facility. The Debtor is presently leasing its manufacturing space from ONX3 LLC. The Debtor has retained a small number of tenants sub-leasing office space from the Debtor.

15. On May 1, 2013, the Court denied the Debtor's First Proposed Disclosure Statement. The First proposed Disclosure Statement had been submitted prior to the sale of the

{M0259774.2 }

Debtor's real estate. Upon the sale of the Debtor's real estate and the satisfaction of all of the Secured Claims against the Debtor, most of the projections in the First Disclosure Statement and Plan would have to modified. In addition, the Debtor wished to modify the terms of the First Disclosure Statement and Plan in light of the changes to its finances and operations caused by the sale of its real estate.

16. Throughout this Bankruptcy, Debtor has made considerable efforts to market its assets for the benefit of the estate.  The Debtor has continued operations, met its obligations under existing supply contracts, and acquired additional customers to whom it supplies flatware or provides plating services.  Debtor has streamlined operations, expanded its customer base, and maximized profits throughout the Bankruptcy.

### F. **Projected Recovery of Avoidable Transfers**

The Debtor has not yet completed its investigation with regard to prepetition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

### G. **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H. **Current Financial Conditions**

The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in Exhibit B.

## III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. **What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that

required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

      1. Administrative Expenses

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | See Debtor's Budget in Exhibit C | Paid according to the terms under which the obligation was incurred, or upon the Effective Date; whichever is later. |
| | | |
| Professional Fees, as will be approved by the Court. | Unknown at the present time, but likely to be in excess of $65,000.00 | Paid pursuant to the terms of the Second Final Cash Collateral Order, or according to terms of other Court Order approving such  fees have not been approved by the Court on the Effective Date of the Plan. |
| | | |
| | | |
| Office of the U.S. Trustee Fees | $6,800.00 | Paid in full on the Effective Date of the Plan or date due, whichever is later. |
| | | |

      2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief. The Debtor has received proofs of claims for approximately $3000.00 in such claims related to unemployment taxes, but the Debtor

believes that such claims were actually paid or were otherwise filed in error. In the event such claims are allowed, the Debtor proposes to pay the present value of such claims over a period not exceeding 5 years from the order of relief.

### C. **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. *Class of Priority Unsecured Claims*
Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. To the extent that any such claims are allowed, the Debtor proposes to place these claims in Class 1 and pay these claims in full in cash on the effective date of the Plan to the extent there any such claims. At present, the Debtor does not believe that there are any such priority claims against the Debtor.

2. *Class of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The General Unsecured Claims shall be placed into Class 2. The General Unsecured Claims shall be paid in full over time as described in the Plan. Specifically, the debtor shall make payments to the general unsecured creditors through three tiers of distributions.  These distributions shall be made as follows:

A.      Commencing on the date thirty (30) days after the Effective Date (the "Commencement Date"),  quarterly distributions shall be made by the Debtor to Holders of Allowed Class 2 Claims according to the payment schedule identified in the Plan until the payment of a principal balance of $400,000.00 is complete (hereinafter the "Scheduled Distribution").

B.      After the Effective Date, the Equity Security Holders of the Company shall transfer the personal tax refunds they receive net of personal tax liability as a result of the Debtor's participation in the New York Empire Zone program and the Debtor's status as an S-Corporation back to the Debtor, and the Debtor shall distribute such funds to the Holders of Allowed Class 2 Claims (hereinafter the "Tax Refund Distribution").

C.      The Debtor shall make quarterly distributions to Holders of Allowed Class 2 Claims composed of a percentage of the Debtor's Earnings before Taxes, Interest, and Depreciation (EBITDA) (as defined by GAAP) (collectively hereinafter the "EBITDA Distributions"). The EBITDA Distributions shall be made according to the following schedule:

      a.  6% of the Debtor's EBITDA in excess of $500,000 and up to $1 million.
      b.  10% of the Debtor's EBITDA in excess of $1 million.

The EBITDA Distributions shall be made until either all Allowed Class 2 claims have been paid in full or 16 years have passed since the Effective Date of the Plan, whichever occurs

first.  No EBITDA Distributions shall be made unless the Debtor has sufficient cash on hand to meet operating requirements.

The Debtor believes that between the Scheduled Distributions, the Tax Refund Distribution, and the EBITDA Distribution the General Unsecured Claims shall be paid in full. The General Unsecured Claims are unimpaired.


### 3. *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation such as the Debtor, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The Equity Interests shall be placed in Class 3. The Equity Interests in the Debtor shall retain ownership of the Reorganized Debtor on the Effective Date.  The Equity Interests are unimpaired. The Equity Interests in the Debtor shall be freely transferable to third parties, in whole or in part, upon the Effective Date.


### D. **Means of Implementing the Plan**

### 1. *Source of Payments*

An Excel Sheet describing the Debtor's financial plan and anticipated budget is attached as Exhibit C.

The Debtor will pay the payments due to the General Unsecured Creditors from revenues from ongoing operations. In addition, the Debtor will continue to seek a partner or partners for sale, joint venture, or investment that would utilize the Debtor's specialized flatware manufacturing assets or otherwise raise funds that may be used to make a pre-payment on the Debtor's obligations to the Unsecured Creditors under the Plan.

Lastly, the holders of the Equity interests in the Debtor shall return any income tax refunds, net of personal tax liability, that they receive on account of the Debtor's status as a S-Corporation and the Debtor's participation in any New York State Empire Zone Program. These funds shall be used to fund the Tax Refund Distribution. The amount of the Tax Refund Distribution is dependent upon the calculation of the tax refunds to be received by the Debtor's principals through the New York State Empire Zone Program. Based on information it has received from its accountants, the Debtor estimates that these refunds will be approximately $150,000.00.  These refunds should be disbursed to the Debtor through its principals within the next two years.

During the course of the bankruptcy, the Debtor implemented a revised business model. Prior to the bankruptcy, all manufacturing in New York ceased and was outsourced to Mexico

because of reduced  sales due to the recession and the loss of a major contract with Oneida Limited. The reduced sales volume could not sustain manufacturing in New York.

The Debtor continues to import flatware to supply two large contracts. One contract is for the United States Government Services Administration ("GSA"). The GSA contract supplies the US Navy and other federal departments with flatware. The second contract is with Cutco Cutlery Corp., a specialized cutlery and kitchen utensil retailer based in Olean, New York. The revenue from these sales provides the "base revenue" of the Debtor's continued operations.

Since implementing its revised business model, the Debtor has resumed manufacturing and selling products manufactured in New York. This was made possible as the result of improvements to the economy since 2010 and an increased demand for American made products. Sales of the Debtor's domestically manufactured product to Silver Superstore (a silverware retailer based in Seattle, Washington) and Liberty Tabletop (a website that makes direct sales of the Debtor's inventory located at www.libertytabletop.com), as well as other customers, have gone from zero to in excess of $500,000 in 2012.

If this trend continues, which the Debtor's management expects, and the Debtor begins selling to traditional retailers such as department stores, it will reach production/sales levels in the $1.7 million range during 2014, provided that the company secures access to working capital to finance that production. In addition to domestic production, the Debtor expects to have revenue from its existing import contracts in 2014 in the amount of $1.6 million. Total revenue projections for 2014 are $3.3 million.

Demand for the Debtor's products is based on increasing demand for goods Made in the USA.  The Debtor is the only remaining manufacturer of flatware in the United States.

In addition to the recent success selling to internet flatware retailers, department store and "big box" retailers have inquired if the Debtor can supply them with product.  The Debtor's ability to sell product to these customers is limited by its status under Chapter 11 and, most importantly, by its lack of working capital required to finance the purchase of raw materials, work-in-progress, and the accounts receivable associated with larger scale manufacturing.

In order to resolve this working capital shortfall and retire the debt associated with the Plan, the Debtor intends to seek an investor/partner or joint venture as soon as the Plan is confirmed.  Talks are underway with several prospects giving the company reason to be optimistic that such a transaction can be entered into shortly after confirmation of the Plan. Depending on the scope and terms of that partnership or joint venture, the Debtor will make plans to grow domestic manufacturing from the current $500k sales rate to the $1.7m range.

2. *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor on the Effective Date shall be Matthew Roberts as President and Gregory Owens as Vice- President.

{M0259774.2 }

E. **Risk Factors**

The proposed Plan has the following risks:

Like all manufacturers, the Debtor will be subject to the vagaries of the economy. In the event the Debtor is required to engage in a forced liquidation, then it is likely that the unsecured creditors would not continue to receive regular payments from the Debtor (with the exception of the Tax Refund Distribution).

F. **Executory Contracts and Unexpired Leases**

The Plan identifies all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also describes how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not identified in the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

G. **Tax Consequences of Plan**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/or Advisors.*

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan *(e.g.,* Secured Claims, Administrative Claims and Priority Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes or new interpretations of these rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested an opinion of counsel with respect to any of the tax aspects of the Plan. In addition, the Debtor has not requested a ruling from the IRS concerning the federal income tax consequences of the Plan, and the consummation of the Plan is not conditioned upon the issuance of any such ruling. Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt.

This summary does not address state, local or foreign income or other tax consequences of the Plan, not does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts or tax-exempt entities other than the Debtor).

This summary also assumes that the various third-party debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form, and that Claims are held as capital assets.

*Accordingly, the following summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to a holder of a Claim.*

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A. Consequences to the Debtor

The Debtor is an S Corporation. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax status of the Debtor and the Plan so provides. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences to it, including, without limitation, in connection with (i) the discharge of debt pursuant to the Plan, or (ii) any other transaction contemplated thereunder.

B. Consequences to the Holders of Unsecured Claims

1. Gain or Loss

{M0259774.2 }

In general, each holder of an Unsecured Claim against the Debtor will recognize gain or loss equal to the difference, if any, between (i) the "amount realized" by such holder in satisfaction of its Claim (other than amounts, if any, paid in respect of any Claim for accrued but unpaid interest and other than any amounts treated as imputed interest as further described below) and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). A holder's "amount realized" generally will equal the amount of Cash received by such holder. For a discussion of the federal income tax consequences to holders of any Claim for accrued but unpaid interest, see below.

Where gain or loss is recognized by a holder in respect of its Allowed Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

2. Distribution in Discharge of Accrued Interest or OID

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation will be respected by the IRS or a court of law for federal income tax purposes.
In general, to the extent that any distribution to a holder of a Claim is received in satisfaction of interest or original issue discount ("OID") accrued or amortized during the time such holder held the Claim, such amount will be taxable to such holder as interest income (if not previously included in such holder's gross income). Conversely, a holder will generally recognize a deductible ordinary loss to the extent of any Claim for accrued interest that previously was included in its gross income and that is not paid in full. However, the treatment of unpaid OID that was previously included in income is less clear. The IRS has privately ruled that a holder of a debt obligation in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID. Accordingly, it is possible that, by analogy, a holder of a Claim in a taxable exchange would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full. *Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest or OID for federal income tax purposes.*

3. Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding). Under federal

income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%). Backup withholding generally applies if the holder: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participates, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's federal income tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

1. *What are the requirements for Plan confirmation?*

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

**The deadline for filing a proof of claim in this case was April 2, 2011.**

2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.***

4. *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

B. **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by A cramdown on non-accepting classes, as discussed later in Section [B.2.].

1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

{M0259774.2 }

2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a cram down plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not discriminate unfairly, and is a fair and equitable toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

## C. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit D. As is evident from the information in Exhibit D, after the payment of administrative claims, professional fees, and other costs, it is likely that there would be almost no recovery for the unsecured creditors in the event of a Chapter 7 liquidation of the Debtor's business.

## D. **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1. *Ability to Initially Fund Plan*

Based on the projections identified in Exhibit C,  the management of the Debtor believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Debtor must also show that it will have enough cash over the life of the Plan to make the required payments due under the Plan.

As stated above and in Exhibit C, the Debtor believes that it will have sufficient funds to continue to make the Scheduled Distributions required by the Plan even if it only continues its current import operations to supply the United States Government and Cutco Cutlery Corp. Moreover, as stated above, the Tax Refund Distribution will be made to the General Unsecured

Creditors regardless of the Debtor's future financial performance as it is based on refunds from earlier filed tax returns.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***


## V. **EFFECT OF CONFIRMATION OF PLAN**
### A. **DISCHARGE OF DEBTOR**

<u>Discharge.</u> On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

Furthermore, but in no way limiting the generality of the foregoing, the Debtor, the Creditors' Committee, and their respective present and former officers, directors, members, shareholders, board members, representatives, employees, advisors, attorneys and agents acting in such capacity shall have no liability whatsoever to any holder or purported holder of a Claim, or any other entity for any act or omission in connection with, or arising out of, this Plan, the Disclosure Statement, the negotiation of the Plan, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under this Plan, or any transaction contemplated by this Plan or the Disclosure Statement or in furtherance thereof, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.


## B. **Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

Dated: July 17, 2013                    **MACKENZIE HUGHES LLP**

                                         /s/ Neil J. Smith
                                        By:     Neil J. Smith, Esq.
                                        NDNY Bar Roll Number: 602185
                                        Attorneys for Debtor and
                                        Debtor in Possession
                                        101 South Salina Street, Suite 600
                                        PO Box 4967
                                        Syracuse, New York 13202
                                        nsmith@mackenziehughes.com
                                        (315)233-8226